# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA
# EASTERN DIVISION

| | |
|---|---|
| SELF ADVOCACY SOLUTIONS N.D., LEAGUE OF WOMEN VOTERS OF NORTH DAKOTA, MARIA FALLON ROMO,<br><br>Plaintiffs,<br><br>v.<br><br>ALVIN JAEGER, in his official capacity as Secretary of State, DEBBIE NELSON, in her official capacity as County Auditor of Grand Forks County,<br><br>Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Case No. _____ |

Plaintiffs, by and through their undersigned attorneys, allege as follows:

**INTRODUCTION**

1. As the COVID-19 crisis stretches into its second month, it is becoming increasingly clear that this pandemic represents not only a threat to our health, but to the health of our democracy. Recognizing the danger of in-person voting, on March 26, 2020, Governor Burgum authorized upcoming elections be held entirely by mail, suspending the requirement that North Dakota counties offer at least one in-person polling location. To date, every county in North Dakota has embraced this safety measure and plans to conduct their June 9, 2020 elections exclusively by mail.

2. As more North Dakotans rely on absentee ballots to exercise their fundamental right to vote, however, they face a growing risk of being disenfranchised by North Dakota's error-prone signature matching verification process. Under this system, election officials must compare the

1

signature on a voter's absentee ballot with the one on the voter's absentee ballot application to determine whether the signatures "correspond." If the official—who is provided no training in signature verification or document examination—believes that the signatures do not match, the ballot is rejected and the vote is not counted. The voter is never informed their ballot is impaired or given an opportunity to resolve the issue and have their vote counted.

3. The State rejects hundreds of ballots cast by eligible North Dakota voters every election because of this unreliable ballot verification process, disproportionately disenfranchising voters prone to signature variability, specifically people with disabilities, non-native English speakers, and both young and elderly voters.

4. North Dakota's failure to inform these voters that their ballots are impaired or provide them any opportunity to cure the impairment deprives them of their fundamental right to vote in violation of the First and Fourteenth Amendments to the United States Constitution and of their right to due process of law in violation of the Fourteenth Amendment to the United States Constitution. Plaintiffs bring this action to prevent North Dakota from further disenfranchising eligible voters for benign signature issues before the upcoming June 9, 2020 state elections and future elections.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

6. This Court has personal jurisdiction over Defendants, who reside in this district, in their official capacities.

7. Venue lies in this district pursuant to 28 U.S.C. § 1391(b) and in the Eastern Division pursuant to Local Rule 1.1 because Plaintiff Romo resides in Grand Forks County,

Plaintiff Self Advocacy Solutions N.D. is based in Grand Forks County, and Plaintiff League of Women Voters of North Dakota is based in Cass County, all in this Division.

8. This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

### *Plaintiffs*

9. Plaintiff Maria Fallon Romo is a Grand Forks, North Dakota resident and U.S. citizen. She has lived in Grand Forks for approximately thirty years. She has been an active voter for many years and votes regularly. Ms. Romo is a special education paraeducator.

10. Although Ms. Romo has typically voted in person, in 2018, Ms. Romo chose to vote by absentee ballot for the first time believing it would be easier and more convenient for her. She followed the instructions to submit the absentee ballot application, received her absentee ballot in the mail, and submitted her absentee ballot on October 16, 2018, well in advance of the deadline.

11. Since then, she has assumed that her vote was counted. It was not. Instead, because local election officials determined that her signatures did not "correspond," her ballot was rejected without providing her any notice or opportunity to confirm her signature.

12. Ms. Romo was diagnosed with multiple sclerosis ("MS") in 1997. As a result of her MS, it is difficult for her to write neatly or consistently. Difficulty with writing and changes in handwriting are common side effects of MS.

13. Ms. Romo did not know that a signature on her ballot application that did not "correspond" with the one provided on her ballot could invalidate her ballot, particularly without any notice to her beforehand. She only recently discovered that her 2018 ballot was not counted. She has reviewed her absentee ballot application and voter affidavit, and has confirmed that the

3

ballot reviewed by the Grand Forks election officials was her own. If she had received *any* notice of the alleged mismatched signature on her voter affidavit, she would have taken all steps necessary to confirm her signature and ensure her ballot was counted.

14. Ms. Romo wishes to vote in the June 9 election in North Dakota. In order to do so, she will have to vote by mail because Grand Forks, in light of the ongoing pandemic, has shifted to an exclusively vote-by-mail election. On June 9, in addition to the statewide primary contests, her city of Grand Forks is having an election for mayor. She also wishes to vote in future elections, and would likely do so by absentee ballot if she had some assurance her ballot would not be rejected without any notice or opportunity to cure.

15. Ms. Romo now fears that she will be disenfranchised yet again if she votes by mail and an election official determines that her signatures do not "correspond."

16. Plaintiff Self Advocacy Solutions N.D. ("SAS") is a nonprofit organization based in Grand Forks, North Dakota with members living across the state. SAS's mission is to promote human and civil rights for people with disabilities. SAS empowers people with disabilities to advocate for their rights to ensure equal opportunities, access, and inclusion as full members of society. SAS encourages its members to exercise their right to vote in North Dakota elections, and has advocated for its members to vote by absentee ballot.

17. Many SAS members have disabilities that affect their ability to sign their name, and many SAS members' signatures are not visually consistent across time as a result of their disability. As a result, SAS members are at particular risk of having their absentee ballot signatures deemed to not "correspond" with their absentee ballot applications.

18. Plaintiff League of Women Voters of North Dakota ("LWVND") is a nonpartisan political organization based in Fargo, North Dakota with members living throughout the state.

LWVND's mission is to encourage informed and active participation in government, work to increase understanding of major public policy issues, and influence public policy through education and advocacy. LWVND is an affiliate of the League of Women Voters of the United States which has over 700 state and local Leagues across all 50 states, the District of Columbia, Puerto Rico, Virgin Islands, and Hong Kong.

19. LWVND conducts its activities through two local chapters, one serving the greater Fargo region and another serving Bismarck-Mandan. LWVND encourages its members and the public to exercise their right to vote in North Dakota elections. LWVND also educates its members and the public about how to vote by absentee ballot, at public meetings, online, and during programming on community access channels.

20. LWVND has members whose signatures may not be visually consistent over time, including elderly voters and voters with disabilities, who are at risk of having their absentee ballot signatures deemed not to "correspond" with their absentee ballot application.

*Defendants*

21. Defendant Alvin Jaeger is the North Dakota Secretary of State and is sued in his official capacity. The North Dakota Secretary of State is the State's supervisor of elections. The Office of the North Dakota Secretary of State is responsible for "supervis[ing] the conduct of elections," "implement[ing] uniform training programs for all election officials," "publish[ing] . . . a manual on election procedures," and "assur[ing] uniform voting opportunities throughout the state." N.D.C.C. §§ 16.1-01-01(1), (2)(a), (2)(c), (3).

22. Defendant Debbie Nelson is the County Auditor of Grand Forks County, North Dakota, and is sued in her official capacity. The County Auditor is the "county administrator of elections" and "is responsible to the secretary of state for the proper administration within the

auditor's county of state laws, rules, and regulations concerning election procedures." *Id.* § 16.1-01-01(4). Before each primary and general election, the County Auditor must conduct "training sessions on election laws and election procedures for election officials in the county," including all election board members and poll clerks. *Id.* § 16.1-05-03(2). The County Auditor must also sit on the county canvassing board, which makes the final determination on ballots rejected due to a signature mismatch. *Id.* § 16.1-15-15.

## FACTS

### *Absentee and Mail Ballots are Crucial to Voter Access in North Dakota*

23. The option to vote an absentee ballot has become a crucial means by which North Dakotans cast their ballots. All eligible voters in North Dakota may vote by absentee ballot. *Id.* § 16.1-07-01. In 2018, nearly thirty percent of all North Dakota voters cast their ballots via absentee ballot. Likewise, in 2016 and 2014, absentee ballots accounted for approximately one-fourth of ballots cast.

24. North Dakota has authorized counties to conduct elections by mail ballot so long as counties maintain one polling place open for in person voting on Election Day. *Id.* §16.1-11.1-01. In such elections, the county auditor sends an application for a mail ballot to each voter listed in the Central Voter File. *Id.* § 16.1-11.1-02. Mail ballot elections largely follow the same rules and procedures as the ordinary absentee ballot process, including the form of application and ballot and the manner of verification of ballots. *Id.* §§ 16.1-11.1-01, *et seq*. Many North Dakota counties take advantage of this provision to conduct mail ballot elections with very limited in-person voting options.

25. During the national emergency due to the COVID-19 pandemic, voters' access to and confidence in mail ballots is crucial. In light of social distancing guidelines, in-person voting

at the same levels as ordinary elections will not be safe in upcoming elections, particularly for those most vulnerable to the virus.

26. On March 26, 2020, in response to the COVID-19 crisis, Governor Burgum authorized counties to conduct upcoming elections *solely* by mail by suspending the ordinary requirement that counties conducting mail ballot elections maintain at least one in-person polling location.[1] And to further encourage voting by mail, he ordered the Secretary of State to send mail ballot application forms, instructions, and a return envelope to all individuals listed in the state's Central Voter File. In his executive order, Governor Burgum also noted that 33 of North Dakota's 53 county commissions had authorized mail ballot elections, and strongly encouraged the remaining counties to follow suit.

27. As of April 23, all counties have authorized mail ballot elections for June 9.[2]

28. Grand Forks County, where Plaintiff Romo resides, will only offer absentee voting for the June 2020 primary, and will have no in-person voting option available.[3]

29. The Governor's executive order will remain in place "for the duration of the declared emergency." Even after the end of the "declared emergency," social distancing guidelines and precautions for those most vulnerable will remain of the utmost importance.

30. As such, elections in 2020 will see a substantial increase in vote by mail in North Dakota.

---

[1] The order requires counties to maintain at least one assistive ballot marking device in the county courthouse during normal hours of operation. Exec. Order 2020-13 (Mar. 26, 2020), https://www.governor.nd.gov/sites/www/files/documents/executive-orders/Executive%20Order%202020-13%20Elections.pdf.

[2] North Dakota Health, *North Dakotans to Receive Ballots by Mail for June Election* (Apr. 23, 2020), https://www.health.nd.gov/news/north-dakotans-receive-ballots-mail-june-election.

[3] Grand Forks County Auditor, *June 9, 2020 Primary Election*, http://gfcounty.nd.gov/sites/default/files/pdf/June%209%202020%20Primary%20Election.pdf (last visited Apr. 24, 2020).

***Absentee Voting Process in North Dakota***

31. At any time in an election year, any qualified elector may apply—in person or via facsimile or electronic mail—for an absentee ballot. N.D.C.C. § 16.1-07-05(1). The applicant can choose to apply for all statewide elections in the calendar year or only the next proximate election. *Id.*

32. There is no deadline to apply for an absentee ballot, but it must be submitted "in a timely manner so as to allow the applicant to receive, complete, and mail the absentee ballot before the day of the election." *Id.* § 16.1-07-05(3).

33. The absentee ballot application collects, *inter alia*, the following information: the applicant's name, current residential address, mailing address, telephone number (if applicable), date of birth, and identification number from one of the applicant's valid forms of identification. *Id.* § 16.1-07-06. Except where the applicant is unable to do so,[4] the application must be signed by the applicant. *Id.*

34. Upon receipt of a valid and complete absentee ballot application, the appropriate election official—ordinarily the county auditor—must send or personally deliver the voter an absentee ballot along with a return envelope, secrecy envelope, and set of instructions. *Id.* § 16.1-07-07.

35. The return envelope for an absentee ballot includes a voter affidavit that requires the voter's precinct, name, residential address, and voter's signature. *Id.*

36. Absentee ballots must be postmarked by the day before Election Day *and* received before the county canvassing board meets on the sixth day after Election Day. *Id.* §§ 16.1-07-09,

---

[4] In this case, the voter can place a mark on the application and a disinterested individual must sign as a witness to the application. *Id.* § 16.1-07-06(2).

16.1-15-17.

37. For absentee ballots received by the close of polls on Election Day, the election board members and poll clerks of the relevant precinct, or any designated absentee ballot precinct, must "compare the signature on the application for an absent voter's ballot with the signature on the voter's affidavit . . . to ensure the signatures correspond." *Id.* § 16.1-07-12. The statute provides no instruction or guidance for how to determine if the signatures "correspond."

38. If the signatures do not "correspond," "the vote may not be allowed" and the election inspector or election judge is instructed to mark the ballot as rejected and forward to the county canvassing board for a final determination. *Id.* §§ 16.1-07-12, 16.1-15-19. If the canvassing board agrees that the signatures do not "correspond," the ballot is rejected. As a practical matter, this additional "check" by the canvassing board often provides no winnowing effect. For example, in Kidder County, seven ballots cast in the 2018 election were sent to the canvassing board for mismatched signatures; all of them were rejected by the canvassing board. In that election, the canvassing boards in at least three more counties—McKenzie, McLean, and Traill—also rejected every mismatched signature ballot sent to the canvassing board for a final determination.

39. For absentee ballots received after the close of polls on Election Day but received before the canvassing board meets, the ballots are forwarded to the canvassing board and if they are timely (i.e. postmarked by the day before Election Day), the canvassing board determines whether "the signatures on the absentee ballot application and the voter's affidavit were signed by the same person before allowing the ballot to be tallied." N.D.C.C. § 16.1-07-09. The statute provides no instruction or guidance for how to determine if the signatures "were signed by the same person." *Id.* In 2018, the McLean County canvassing board declared 6 of the 52 late-arriving ballots—over ten percent—void due to alleged signature mismatch.

40. Defendant Jaeger's Election Officials' Manual provides no further guidance on the signature matching process. Indeed, the sum total of its guidance on this process is as follows: "Compare the signature on the application for the absentee ballot with the signature on the back of the absentee ballot envelope (the voter's affidavit) to ensure the signatures match." Ex. A (2018 Election Officials' Manual).

41. Upon information and belief, election officials receive *no* training on signature matching, and the process is entirely unregulated from county to county. For example, training materials developed by McKenzie County simply instruct election officials to "compare signatures."

42. Some county canvassing boards consider the voter's "situation and history" in assessing signatures, leaving the voter's ballot at the discretion and personal knowledge of the county canvassing board officials. For example, according to 2018 minutes of the Dickey County canvassing board, the board rejected two ballots outright for mismatched signatures, but for at least one other ballot, considered the "situation and history" of the voter, including the fact that the voter was "a long-term care resident that had signed on the application in June." Because the board happened to know and recall extrinsic facts about that particular voter, the ballot was accepted.

43. When an absentee ballot is flagged due to any perceived signature "mismatch," the election board and/or the canvassing board do not use the available contact information to notify the voter of the problem. Therefore, the voter is given no opportunity to confirm their signature and ensure their ballot is counted. Indeed, the voter is *never* notified of the rejection, even after the final canvassing.

44. Nothing on the absentee ballot application warns voters that the signature on the application must match the signature on their voter affidavit. *See* Ex. B (absentee ballot

application). Likewise, nothing on the voter affidavit warns the voter that their signature must "correspond" with their signature on the absentee ballot application in order for their ballot to count. *See* Ex. C (voter affidavit). Likewise, nothing in the Secretary of State's instructions for absentee voting alerts voters to this disenfranchising danger. Ex. D (Secretary of State Absentee Voting Instructions).

### *North Dakota's Flawed Signature Matching Procedure Deprives a Significant Number of Voters of Their Right to Vote and Procedural Due Process*

45. Reliance on signature verification is an inherently flawed means of determining whether an absentee or mail ballot was fraudulently or inappropriately cast. No two signatures are identical, even if provided by the same signer. Indeed, courts and experts agree that a person's signature will vary from one signing (i.e., the absentee ballot application) to another (i.e., the voter affidavit) for any number of intentional or unintentional reasons, including factors like age, change in physical or mental condition, disability, stress, and means of signing. *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 205 (D.N.H. 2018). Digital signatures or those provided with a stylus, for example, will often appear different from a "wet-ink" signature done by hand. But such to-be-expected variations are difficult to discern from fraudulent variations even for a trained and certified Forensic Document Examiner ("FDE"), especially where the reviewer has only two exemplars to compare.

46. This is particularly so for untrained and lay evaluators like election officials with no expertise in forensic handwriting analysis. Laypersons—as compared to FDEs—have a significantly higher rate of error in determining whether signatures are genuine. Lay elections officials are more likely than trained examiners to make an incorrect signature-comparison determination and are especially likely to incorrectly decide that the signatures do not "correspond." According to one study, laypeople are more than 3 ½ times more likely than FDEs

11

to deem authentic signatures to be non-genuine.

47. As a result of this flawed process, year after year, election after election, hundreds of North Dakotans are disenfranchised without their knowledge. As described above, Plaintiff Romo is one such voter. Kourtney Culver is another such voter. Ms. Culver was born and raised in North Dakota and started voting in the state as soon as she turned 18. Although she has since moved out of state for work, in 2018, Ms. Culver was a North Dakota resident who attended school out-of-state. As such, she sought to vote by mail. She submitted an absentee ballot application, received her ballot, and returned it on time. But her vote was not counted. Ms. Culver did not discover that her vote did not count until this year. She has reviewed her absentee ballot application and voter affidavit and confirmed her signature on both.

48. In 2018, according to the Election Administration and Voting Survey ("EAC Survey") conducted by the Election Assistance Commission,[5] 334 North Dakota ballots were rejected for an alleged signature mismatch.[6] This accounted for over 60 percent of *all* rejected absentee ballots. And rejection rates varied significantly across counties; while many reported no signature match issues and others rejected less than .25% of ballots for signature issues, Morton County rejected 1.14% of its absentee ballots for alleged signature mismatches, and Nelson County rejected 1.74% of its absentee ballots for alleged signature mismatches. *Id.*

49. It is not uncommon for elections in North Dakota to be decided by far fewer votes

---

[5] The Election Administration Commission is a federal agency created by the Help America Vote Act in 2002. It is charged with, among other things, studying election issues and providing resources to states for election administration. It also conducts a biennial survey of all 50 states to collect data on their elections. *See About the U.S. EAC*, http://eac.gov/about-the-useac.

[6] The EAC Survey is based on self-reported survey data from each county. Based on a comparison of county-level canvassing minutes in some counties to the EAC survey data, it appears that some of the reported survey data may be underinclusive. Therefore, these figures may underreport the actual number of votes affected.

than those rejected for signature match in the November 2018 election. In the same November 2018 election, Senate District 25 was decided by 21 votes; House District 43 was decided by 35 votes; House District 27 was decided by 189 votes;[7] a Rolette County Commissioner race was decided by 31 votes;[8] and a Grand Forks County Commissioner race was decided by 49 votes.[9] In June 2018, a West Fargo School Board race was decided by fewer than *twenty* votes.[10] In 2016, the Senate District 46 race was decided by fewer than *forty* votes.[11]  Likewise, in 2004 and 1996, the statewide Commission of Agriculture election was decided by a mere 122 votes and 283 votes, respectively.[12]

## CAUSES OF ACTION

**Count I:      Denial of Procedural Due Process in Violation of the Fourteenth Amendment, 42 U.S.C. § 1983**

50.     Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

---

[7] ND Voices, Official 2018 General Election Results, Legislative District Results (Dec. 11, 2019), https://results.sos.nd.gov/resultsSW.aspx?text=Race&type=LG&map=DIST.
[8] ND Voices, Official 2018 General Election Results, Rolette County (Dec. 11, 2019), https://results.sos.nd.gov/resultsSW.aspx?text=All&type=CTYSPEC&map=CTY&cty=40&name=Rolette.
[9] ND Voices, Official 2018 General Election Results, Grand Forks County (Dec. 11, 2019), https://results.sos.nd.gov/resultsSW.aspx?text=All&type=CTYSPEC&map=CTY&cty=18&name=Grand%20Forks.
[10] Danielle Church, *West Fargo School Board Could Be Doing An Election Recount*, KVRR Local News (June 13, 2018), https://www.kvrr.com/2018/06/13/west-fargo-school-board-could-be-doing-an-election-recount.
[11] ND Voices, Offiial 2016 General Election Results, Legislative District Results (Nov. 18, 2016), https://results.sos.nd.gov/ResultsSW.aspx?text=Race&type=LG&map=DIST&eid=292.
[12] State Canvassing Board, *North Dakota's Official Abstract of Votes Cast at the General Election Held on November 2, 2004*, https://vip.sos.nd.gov/pdfs/Abstracts%20by%20Year/2000%20through%202008%20Statewide%20Election%20Results/2004/General%20Election%2011-02-2004.pdf; State Canvassing Board, *Official Abstract of Votes Cast at the General Election Held November 5, 1996*, https://vip.sos.nd.gov/pdfs/Abstracts%20by%20Year/1990%20through%201998%20Statewide%20Election%20Results/1996/General%20Election%2011-05-1996.pdf.

51. An individual has a liberty interest in the fundamental right to vote that is protected by the doctrine of procedural due process. *See, e.g.*, *Cook v. Randolph Cty.*, 573 F.3d 1143, 1152 (11th Cir. 2009) (noting that "[t]he Constitution guarantees procedural and substantive due process when a liberty interest is at stake," including "the right to vote"); *Barefoot v. City of Wilmington*, 306 F.3d 113, 124 n.5 (4th Cir. 2002) ("The right to vote . . . is certainly a protected liberty interest.").

52. And North Dakotans have a statutorily protected liberty interest in voting by mail. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies.").

53. At an absolute minimum, where a protected interest is at stake, due process requires notice and the opportunity to be heard. *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 313 (1950) ("[T]here can be no doubt that at a minimum [Due Process] require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing.").

54. And notice and opportunity to be heard must be *pre*-deprivation. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

55. That is particularly true when the deprivation will result in irreparably injury. *See Winegar v. Des Moines Indep. Comm. Sch. Dist.*, 20 F.3d 895, 901 (8th Cir. 1994); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

56. North Dakota's use of an inherently flawed system of signature verification to determine the validity of mail-in ballots without *any* notice or *any* opportunity to cure fails the

most basic requirements of procedural due process.

57. In order to determine how much process is due in any given situation, a court must consider and balance three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976).

58. Here, the "private interest" is nothing less than the fundamental right to vote, "preservative of all rights." *Reynolds v. Sims,* 377 U.S. 533, 562 (1964).

59. The risk of erroneous deprivation because of benign signature discrepancies or technical errors is significant. Election officials are not trained handwriting experts; many intentional and unintentional factors lead to benign signature discrepancies; and the standardless process is designed to disenfranchise voters due to nothing more than poor penmanship.

60. Implementing procedures to provide absentee voters with notice and an opportunity to cure would not impose an undue burden on the State. Defendant and local boards of elections already maintain records during the ordinary course of business, including in the Central Voter File, that contain voter contact information, including addresses, phone numbers, and e-mail addresses. Indeed, all this information is included on the absentee ballot application that officials compare when assessing signatures. The additional burden to provide voters with timely notice that their absentee ballot may be rejected, and an opportunity to cure the error, is minimal.

61. North Dakota's current signature verification procedure denies North Dakota voters procedural due process in violation of the Fourteenth Amendment.

**Count II:**     Deprivation of the Fundamental Right to Vote in Violation of the First Amendment and Fourteenth Amendments, 42 U.S.C. § 1983.

62. Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

63. "There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1440-41 (2014). The Supreme Court has recognized that "voting is of the most fundamental significance under our constitutional structure." *See Burdick v. Takushi*, 504 U.S. 428, 433-44 (1992).

64. When analyzing the constitutionality of a restriction on voting, the Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

65. Defendant's flawed and standardless signature verification process rejects a significant number of validly cast ballots every election cycle as a result of benign discrepancies or technical errors. Defendant denies these individuals the right to vote without any pre-deprivation notice or opportunity to confirm their ballots. Such a system imposes a severe burden on voters' fundamental right to vote.

66. The severity of this burden is exacerbated by voters' increasing need to rely on mail ballots to effectively cast a ballot while safeguarding their health. Voters should not be required to risk their health or lives to cast a ballot they can be confident will count.

67. Defendant can proffer no justification for this standardless and procedurally deficient system that can outweigh the injury of the rejection of thousands of ballots each election

without any assurance those ballots were fraudulent or improper.

68. North Dakota's signature verification system is not designed to carefully ferret out fraud but rather is set up to sweep hundreds of eligible voters into its net. Each time a county board of elections—comprised of laypersons with no expertise in handwriting analysis—subjectively believes there is a mismatch between the signature accompanying the voter's absentee ballot and the signature in the voter's file, that ballot is not counted, notwithstanding the many benign factors that can cause signature variation. And those factors—which may include age, disability, national origin, or educational background—can place particularly vulnerable voters at heightened risk.

69. North Dakota's current signature verification procedure unduly burdens the right to vote in violation of the First and Fourteenth Amendments.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs request that this Court:

1. Enter a declaratory judgment that N.D.C.C. §§ 16.1-07-09, 16.1-07-12—insofar as they mandate a signature verification process for mail-in ballots without providing voters with notice and opportunity to cure—deprive voters of procedural due process in violation of the Fourteenth Amendment to the Constitution of the United States;

2. Enter a declaratory judgment that N.D.C.C. §§ 16.1-07-09, 16.1-07-12—insofar as they mandate a signature verification process for mail-in ballots without providing voters with notice and opportunity to cure—imposes an undue burden on the right to vote in violation of the First and Fourteenth Amendments to the Constitution of the United States;

3. Enter preliminary and permanent injunctions enjoining Defendants, their agents,

employees, and successors, and all those persons acting in concert or participation with them from rejecting voters' ballots on the basis of signature verification failure without providing affected voters with adequate and meaningful notice and an opportunity to cure; and requiring Defendant Jaeger to issue guidance to North Dakota's county election officials instructing them to provide all voters with adequate and meaningful notice and opportunity to cure before rejection on the basis of signature verification;

4. Award Plaintiffs their costs and reasonable attorneys' fees incurred in this action; and

5. Grant such other relief the Court may deem just and proper.

Dated: May 1, 2020                                               Respectfully submitted,

Mark Gaber*                                                      /s/ Derrick Braaten
Danielle Lang*                                                   Derrick Braaten (ND#06394)
Dana Paikowsky*                                                  BRAATEN LAW FIRM
  ▲ Licensed in C.A. only; supervision by                        109 North 4th Street, Suite 100
    Danielle Lang, a member of the D.C. Bar.                     Bismark, ND 58501
Aseem Mulji*                                                     Telephone: (701) 221-2911
  ▲ Licensed in C.A. only; supervision by                        derrick@braatenlawfirm.com
    Danielle Lang, a member of the D.C. Bar.
CAMPAIGN LEGAL CENTER                                            Sarah M. Vogel (ND#03964)
1101 14th Street NW, Suite 400                                   SARAH VOGEL LAW FIRM
Washington, DC 20005                                             P.O. Box 385
Telephone: (202) 736-2200                                        Bismarck, ND 58502-0385
mgaber@campaignlegal.org                                         Telephone: (701) 355-6521
dlang@campaignlegal.org                                          sarahvogellaw@gmail.com
dpaikowsky@campaignlegal.org
amulji@campaignlegal.org

* Motions for admission *pro hac vice*                           *Counsel for Plaintiffs*
forthcoming